**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-12-01335-PHX-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Marlon Moore, | |
| Defendant. | |

Defendant Marlon Moore has filed a motion challenging the voluntariness of statements made to law enforcement officers and a motion to suppress the results of a search of his house. Docs. 20, 21. The Court held an evidentiary hearing on these motions on January 23, 2013. For reasons that follow, the Court will deny both motions.

**I.  Consent to Search of the House.**

**A.  Factual Findings.**

The Court makes the following factual findings based on Special Agent Scott Wagoner's testimony and the exhibits received in evidence at the hearing on January 23, 2013. No other witness testified.[1]

---

[1] Kristen Jones, the woman who gave consent to search Defendant's house, asserted her Fifth Amendment right not to testify at the hearing. This assertion was made through counsel the Court had appointed to represent Ms. Jones at defense counsel's suggestion. Defendant asked the Court to compel the government to confer immunity on Ms. Jones for her testimony at the hearing, but applying the law established by the Ninth Circuit in *United States v. Straub*, 538 F.3d 1147 (9th Cir. 2008), the Court denied Defendant's request. The Court did find that Ms. Jones' testimony would have been relevant, but did not find that "the prosecution intentionally caused the defense witness to invoke the Fifth Amendment right against self-incrimination with the purpose of distorting the fact-finding process[.]" *Id*. at 1162. The Court's reasons for denying

On January 18, 2012, Agent Wagoner, who is with the Department of Homeland Security, received information from a confidential informant that 100 pounds of marijuana had been delivered to a black male of Jamaican descent at 4508 West Fremont, in Laveen, Arizona. Agent Wagoner began surveillance of the house the next morning at 6:00 a.m. He was joined by nine additional federal law enforcement officers at 7:00 a.m., with two uniformed Phoenix Police Officers remaining in the area in case traffic stops were required. At 8:04 a.m., Kristen Jones, Defendant's girlfriend, left the house. Officers saw no other activity for the next several hours.

Prior to arriving at the house, Agent Wagoner determined that Defendant had been arrested in September of 2011 for possession of marijuana with intent to distribute. Law enforcement officers had observed Defendant dropping off boxes at various parcel delivery services. Upon seizing the boxes, officers found they contained marijuana. At the time of the surveillance on January 19, 2013, no charges had been filed against Defendant on the basis of his September arrest. Agent Wagoner was able to determine, however, that several vehicles parked in Defendant's driveway had been involved in the September drop-offs and had been observed at other known drug distribution locations.

At approximately noon on January 19, 2013, Defendant exited the house, opened the garage door, pulled a Honda Accord into the garage, and closed the door. After waiting two more hours with no activity, officers decided to knock on the door and announce their presence. They knocked loudly, identified themselves, and asked that the door be opened. Although they could hear people inside, including children crying and a television, no one responded to the door.

Agent Wagoner decided at this point to obtain a search warrant for the house. He left the scene and traveled to his office where he spent the next several hours drafting an affidavit to support a search warrant. At approximately 7:00 p.m., Agent Wagoner received a telephone call from one of the officers conducting surveillance at the house.

---

Defendant's immunity request were stated in detail on the record during the hearing and will not be repeated in this order.

1    The officer informed Agent Wagoner that he had observed a telephone number painted
2    on the back window of a taxi-like vehicle parked in Defendant's driveway. Agent
3    Wagoner decided to call the phone number to see if he could obtain additional
4    information about the house and its occupants.

5    Agent Wagoner called the number at approximately 7:00 p.m. Ms. Jones
6    answered. Agent Wagoner identified himself and explained that the house was under
7    surveillance for possible drug trafficking. Ms. Jones stated that Defendant Marlon
8    Moore, Ms. Jones' sister, and Ms. Jones' three children were located at the house. Agent
9    Wagoner told Ms. Jones that agents suspected there was marijuana in the house, that they
10   had knocked on the door but had received no response, and that he was in the process of
11   obtaining a search warrant. Ms. Jones stated that she did not want officers to enter the
12   house using a search warrant. She was concerned about her children. She agreed to meet
13   Agent Wagoner at the house, telling him that she had to close up her shop before meeting
14   him there.

15   As a result of this conversation, Agent Wagoner decided to meet Ms. Jones at the
16   house and ask if she would consent to its search. Such a course of action not only would
17   address her concerns about her children, it would also result in a faster search of the
18   house than would the process of obtaining a search warrant. Agent Wagoner accordingly
19   left his office and returned to Defendant's house. While he was waiting for Ms. Jones to
20   arrive, officers conducting surveillance of the house reported that people were possibly
21   jumping over the back fence of the house. As a result, law enforcement moved in more
22   closely and a helicopter was routed to the location to find any individuals who were
23   fleeing from the house. Instead of finding persons who had fled the house, agents found
24   two large boxes that had been thrown over the wall from Defendant's backyard. Agents
25   opened the boxes and found bales of marijuana.

26   Because Ms. Jones had not arrived, Agent Wagoner called her at 8:26 p.m. Ms.
27   Jones stated that she would be there shortly, and arrived at about 8:40 p.m. Agent
28   Wagoner met her vehicle as she drove down the street, stopping her about five houses

from the location under surveillance. By this time the helicopter had gone, but there was a substantial law enforcement presence on the street given the report that people were fleeing from the residence.

Agent Wagoner told Ms. Jones that marijuana had been thrown over the wall from the backyard of the house. He confirmed that no one had left the house. Ms. Jones again expressed concern about her children.

Agent Wagoner asked Ms. Jones if she would consent to a search of the house. She agreed. Agent Wagoner obtained a consent form and presented it to Ms. Jones. The consent form, which was admitted as Exhibit 1 at the hearing, is on Department of Homeland Security letterhead and is titled "Consent to Search." The first paragraph reads: "I have been asked to permit special agents of the Bureau of Immigration and Customs Enforcement to search: 4508 W. Fremont St., Phoenix, Arizona." The address of the house is handwritten on the form. Paragraph 2 says: "I have not been threatened, nor forced in any way." Paragraph 3 says: "I freely consent to this search." The form is signed by Ms. Jones and witnessed by Agent Wagoner and Supervising Agent Rico. It is dated January 19, 2011, which Agent Wagoner testified was an error (the year was 2012), at 8:45 p.m. Ms. Jones thus signed the form about five minutes after arriving at the scene.

Agent Wagoner testified that Ms. Jones was cooperative, but that she was also nervous and concerned for her children. She did not resist the request for consent or the signing of the form. After the form had been signed, Agent Wagoner and other officers discussed the best way to enter the house. They concluded that law enforcement agents should accompany Ms. Jones to the front door and allow her to ask individuals in the house to open the door and exit the house. Ms. Jones agreed. When she arrived at the front door and asked loudly for the occupants to open the door, no one responded. Ms. Jones gave her keys to the officers and they attempted to unlock the door. Because the door had been dead-bolted from the inside, it could not be opened.

Agent Wagoner explained to Ms. Jones that officers could force the door open

using a ram. He stated that they would open the door in this fashion and allow her to ask the occupants to exit the house. She agreed. As a result, an officer hit the front door with a ram, breaking the doorjamb around the deadbolt and causing the door to open. Ms. Jones called for the residents to exit the house, and they did. Defendant, Ms. Jones' sister, Ms. Jones' three children, and another male all exited the house and were asked to sit on the driveway. Officers then conducted a sweep of the house. In the living room they found three more large boxes, like those that had been thrown over the wall, each containing a bale of marijuana. They also found packaging material, scales, and other evidence of a drug distribution operation.

Agent Wagoner testified credibly and without contradiction that Ms. Jones was never taken into custody, never handcuffed, and never confronted with weapons of any kind. She was permitted to retain her phone and keys throughout the process, was never patted down or searched, and was never told to raise her hands or otherwise submit to the officers.

Well after the date of the search, the government obtained Ms. Jones' phone records. They were admitted in evidence at the hearing as Exhibit 6. The records show that Ms. Jones made at least 14 phone calls on January 19, 2012, between the time when she first received a phone call from Agent Wagoner at 7:07 p.m. and her arrival at the house at 8:40 p.m. Most of the phone calls were made to Defendant's sister, who was in the house. The records show that Ms. Jones made a call to her sister shortly before marijuana bales were thrown over the back wall. Thus, it appears possible that Ms. Jones was warning the occupants that officers were planning to search for drugs at the house. This possibility was discussed in connection with Ms. Jones' decision to invoke her Fifth Amendment rights at the evidentiary hearing.

**B.    Analysis.**

A search conducted pursuant to a valid consent is constitutionally permissible. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). Whether a consent to search is voluntary must be "determined from the totality of all the circumstances." *Id*. The

government bears the burden of proving that the consent was freely and voluntarily given. *See Bumper v. North Carolina*, 391 U.S. 543, 548 (1968); *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997).

Ninth Circuit cases have identified five factors to be considered in determining the voluntariness of a consent to search: (1) whether the consenting individual was in custody, (2) whether the officers had their guns drawn, (3) whether *Miranda* warnings were given, (4) whether the consenting person was notified that she had a right not to consent, and (5) whether the consenting person had been told that a search warrant could be obtained. *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002) (citing *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1989)). "It is not necessary to check off all five factors, but 'many of this court's decisions upholding consent as voluntary are supported by at least several of the factors.'" *United States v. Patayan Soriano*, 361 F.3d 494, 502 (9th Cir. 2004)(quoting *Chan-Jimenez*, 125 F.3d at 1327 n.3).

The first two factors suggest that Ms. Jones' consent was voluntary: she was never placed in custody and the officers never drew their weapons. The third factor – whether she was given a *Miranda* warning – is not relevant because she was never in custody. *See Patayan-Soriano*, 361 F.3d at 504.

With respect to the fourth factor, Agent Wagoner did not testify that he advised Ms. Jones that she had the right to refuse consent. "An officer is not *required* to inform the person being searched that [she] has a right to refuse consent; doing so simply weighs in favor of finding consent." *United States v. Vongxay*, 594 F.3d 1111, 1120 n. 6 (9th Cir. 2010) (emphasis in original).

Although this factor is not present, the totality of the circumstances suggests that Ms. Jones' actions were as voluntary as if she had been informed that she did not have to consent to the search. When Agent Wagoner first spoke with Ms. Jones, she was not at the house. When he explained that he was in the process of obtaining a search warrant, she asked that he not do so and said she would meet him at the house. This fact clearly suggests that Ms. Jones understood that the officers could proceed without her consent,

- 6 -

but nonetheless voluntarily suggested that she meet them at the residence. When she arrived, the officers did not suggest she should consent, but instead asked if she would consent. She agreed, having had more than 90 minutes to consider the situation since she first spoke to Agent Wagoner on the phone. The form she signed specifically stated that the consent was freely given, without threats or force. Ms. Jones read the form before she signed it.

With respect to the fifth factor, Ms. Jones was told that a search warrant could be obtained, but the Court does not consider this communication to have been threatening or coercive. In *United States v. Cormier*, 220 F.3d 1103 (9th Cir. 2000), the Ninth Circuit noted that when the consenting party is not in custody "the application of the fifth factor . . . hinges on whether a subject is informed about the possibility of a search warrant in a threatening manner." *Id*. at 1112. Agent Wagoner testified that he did not communicate the possibility of a search warrant in a threatening manner. Rather, when he first spoke with Ms. Jones on the phone, he advised her that he was in the process of obtaining a search warrant as part of informing her about the circumstances that then existed. In response, Ms. Jones asked that the officers not execute a search warrant, and instead offered to meet Agent Wagoner at the house. Her consent to the search was sought more than 90 minutes later.

The Ninth Circuit has also stated that the mention of a possible search warrant, even if communicated in a threatening manner, is given "significantly diminished" weight if probable cause for a search warrant actually exists. *Patayan-Soriano*, 361 F.3d at 504-505. In this case, it appears that Agent Wagoner had probable cause to obtain a search warrant. He had obtained information from a reliable confidential informant that 100 pounds of marijuana had been delivered to a black male, of Jamaican descent, at the house in question.[2] Upon checking information regarding Defendant, Agent Wagoner

---

[2] Agent Wagoner testified that the confidential informant had been proven reliable in a related investigation. He also testified that the confidential informant had not been convicted of or charged with any crime as of January 2012, although she is now in custody.

- 7 -

learned that he had been arrested for possession of marijuana with intent to distribute approximately four months earlier, and that boxes he dropped at shipping locations had been found to contain marijuana. Upon arriving at the house, Agent Wagoner identified vehicles that had been involved in the September activities of Defendant and had been observed at other known drug distribution locations. Agent Wagoner saw Defendant exit the house at approximately noon and drive a Honda Accord into the garage, closing the door behind him. When Agent Wagoner and other officers knocked on the door at 2:00 p.m. and announced their presence, no one responded even though the officers could hear individuals in the house. These circumstances gave rise to "a fair probability or substantial chance of criminal activity" at the house, which is sufficient for probable cause. *United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001). Thus, when Agent Wagoner spoke to Ms. Jones at 7:00 p.m. on the telephone, it appears he had probable cause to obtain a search warrant for the house. By the time Ms. Jones arrived at the residence at 8:40 p.m., two boxes containing bales of marijuana had been thrown over the wall at the house, further confirming the existence of drug trafficking activities at the residence.

Considering the five factors identified by the Ninth Circuit, the Court concludes that Ms. Jones' consent to search was voluntary. She was never placed in custody, officers never drew their weapons, she requested that officers not obtain a search warrant and offered to meet them at the house, she had ample time to think about the situation during the more than 90 minutes it took for her to arrive at the house, she was asked, not directed, to give her consent, she read and signed a written consent form, and the form expressly stated that her consent was given freely and that she had not been threatened or forced in any way. Although the possibility of a search warrant was mentioned, it was not communicated in a threatening manner. In addition, it appears that Agent Wagoner had probable cause to search the house, significantly diminishing the fifth factor of the Ninth Circuit's test.

A remaining issue must be addressed. It is clear from Agent Wagoner's testimony

that Ms. Jones was concerned about the welfare of her children. Agent Wagoner testified that this concern was apparent in each of his conversations with Ms. Jones. Although he could not recall the precise details of the conversations, Agent Wagoner also stated that the prospect of the children being taken into custody by Child Protective Services existed if the search warrant was executed. Agent Wagoner did not testify that this fact was suggested to Ms. Jones by him, or that it was stated in a threatening manner. Rather, it appears to have been part of her concern if a search warrant for drug activity was executed at the house, and part of the reason why she asked that a search warrant not be obtained.

The Ninth Circuit addressed a similar situation in *Patayan-Soriano*. In that case, Ms. Mukai was asked to consent to a search of the motel room where she lived with her boyfriend and two children. An investigating officer asked Ms. Mukai for her consent to search the room, telling her that she had the right to refuse consent, but that if she did, he would obtain a search warrant. 361 F.3d at 500. "Mukai indicated that she was concerned about her two small children, who were still in the room." *Id*. A police officer who was standing nearby "told Mukai that if she did not sign, she might be arrested and her children would be placed in custody with social services." *Id*. Other officers immediately intervened, telling Ms. Mukai that the only way her children would be taken from her and placed with social services would be if she was arrested, and that they did not have any reason to suspect she was involved in criminal activity. They explained that because she was not at risk of being arrested, her children were not at risk of being taken into custody. *Id*.

The Ninth Circuit concluded that Ms. Mukai's fear of losing custody of her children did not negate the voluntariness of her consent to a search of the motel room. This was because other officers clarified that her children would not be taken into custody. The Ninth Circuit also noted that several minutes elapsed between the police officer's threat, the other officers' intervention and retraction of the threat, and Ms. Mukai's signing of the consent form. *Id*. at 503.

- 9 -

In this case, there is no evidence that Agent Wagoner threatened Ms. Jones that her children would be taken into custody if a search warrant was executed. There is no doubt that Ms. Jones was concerned about her children, but the Court cannot conclude that this rendered her consent involuntary. Rather, this concern motivated Ms. Jones to ask that the officers not obtain a search warrant and that they instead meet her at the residence. When she arrived, she was still nervous about the welfare of her children, but she readily agreed to consent to the search, signed the consent form, and participated with officers in obtaining access to the house. Moreover, the entire course of events – the officers' willingness to meet her there, their willingness not to obtain a search warrant, their willingness to involve her in obtaining access to the residence – all suggest that Ms. Jones understood that her children would not be taken into custody as a result of the events that evening. The Court can understand why a mother would be concerned when her children had been in a house all day with police surveillance outside and with suspected drug trafficking activity at the house. The fact that she may have consented in part to ensure the welfare of her children, however, does not suggest that she consented against her wishes. Rather, it suggests that the consent was consistent with her wishes, motivated in part by her concern for her children.

In summary, the Court finds that Ms. Jones' consent was voluntary and knowing. It did not result from forceful, intimating, or threatening activity of the officers. The Court finds the facts of this case less favorable to the defense than those at issue in *Patayan-Soriano*, where an express threat was made. Given the Ninth Circuit's decision in that case, and the Court's finding here that threatening activities were never undertaken by law enforcement officers, the Court concludes that Ms. Jones' understandable concern for her children did not render the consent involuntary.

Considering the totality of the circumstances, the Court concludes that Ms. Jones gave a valid consent to the search. The search therefore was constitutionally permissible and Defendant's motion to suppress will be denied. *Schneckloth*, 412 U.S. at 222.

**II.     Defendant's Waiver of *Miranda* Rights.**

### A. Factual Findings.

Upon emerging from the house, Defendant was handcuffed and seated on the driveway. After an initial sweep of the house had been completed, Defendant was walked down the road to Agent Wagoner's truck. Defendant and Agent Wagoner were accompanied by Special Agent Arellano of the Department of Homeland Security.

Agent Wagoner testified that he read Defendant his *Miranda* rights from a DHS card he carries at all times. The card, which Agent Wagoner read during his testimony at the evidentiary hearing, advises the listener of all *Miranda* rights. Agent Wagoner then asked Defendant if he understood his rights, and Defendant said yes. Agent Wagoner asked if Defendant was willing to waive his rights and talk to Agents Wagoner and Arellano without a lawyer, and Defendant nodded and mumbled "yes." Agent Wagoner testified that he did not have a written waiver form with him at the scene and therefore did not ask Defendant to sign a written waiver.

Agent Wagoner proceeded to ask Defendant biographical questions. Defendant responded. Defendant was calm while answering the questions. Agent Wagoner asked Defendant, who has a Jamaican accent, questions about his home in Jamaica. Defendant never asked to stop talking and never requested an attorney.

After some initial questioning, Agents Wagoner and Arellano took Defendant to their office in Phoenix. They were accompanied by Agent Stachowski and the other male who had been present in Defendant's house. Upon arriving at the office, Defendant was placed in an interview room, was given a bottle of water, and the questioning by Agents Wagoner and Arellano resumed.

Defendant proceeded to make various admissions and give incriminating responses. At no time during the interview did Defendant decline to respond, ask that the questioning stop, or request an attorney. All of the communications were in English. Agent Wagoner had no difficulty understanding Defendant's responses, and it appeared to him that Defendant understood all questions.

Defendant had been read his *Miranda* rights at the truck outside his house at 9:20

1 p.m. The interview at Agent Wagoner's office ended by 11:00 p.m. Defendant was released from custody and permitted to leave the office.

**B.      Analysis.**

For incriminating statements made during a custodial interrogation to be admissible, the waiver of *Miranda* rights must be voluntary, knowing, and intelligent. *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966). A waiver "is knowing and intelligent if, under the totality of the circumstances, it is made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (citations and quotations omitted). There is a presumption against waiver, and the government bears the burden of proving a valid waiver by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *United States v. Bernard S.*, 795 F.2d 749, 751-52 (9th Cir. 1986).

Considering the totality of the circumstances, the Court concludes that Defendant Moore's waiver of his *Miranda* rights was voluntary, knowing, and intelligent. Agent Wagoner testified without contradiction that he read Defendant all of his *Miranda* rights, that Defendant confirmed that he understood his rights, and that Defendant agreed to waive his rights and respond to questions without the presence of an attorney. The time from Defendant's waiver to the completion of Agent Wagoner's questioning was one hour and forty minutes. There is no evidence that Defendant was coerced in any way, that he was confused, or that he did not understand his rights.

Although Defendant's waiver was not written, Defendant Wagoner testified credibly and without contradiction that Defendant was read his *Miranda* rights, confirmed that he understood them, and specifically agreed to waive them. In addition to this waiver on January 19, 2012, Defendant agreed to meet Agent Wagoner at a restaurant two months later, in March of 2012, to answer further questions. His answers during the voluntary March interview were similar and equally incriminating to his answers on January 19, 2012.

Considering the totality of the circumstances, the Court finds by a preponderance of the evidence that Defendant's waiver of his *Miranda* rights was voluntary, knowing, and intelligent. Defendant's motion that the Court find his waiver involuntary will be denied.

**IT IS ORDERED** that Defendant's motions to suppress his statements to police officers and to suppress the results of the search of his residence (Docs. 20, 21) are **denied**.

Excludable delay pursuant to U.S.C. § 18:3161(h)(1)(D) is found to run from 1019/2012.

Dated this 28th day of January, 2013.

_____
David G. Campbell
United States District Judge